NOT FOR CITATION

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAMUEL P. ORTIZ, ) <br> ) <br> Petitioner, ) <br> ) <br> vs. ) <br> ) <br> WARDEN R.H. TRIMBLE, ) <br> ) <br> Respondent. ) <br> ) | No. C 12-1286 LHK (PR) <br><br> ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY |

Petitioner, a state prisoner proceeding *pro se*, filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. The Court ordered Respondent to show cause why the petition should not be granted. Respondent has filed an answer, and Petitioner has filed a traverse. Having reviewed the briefs and the underlying record, the Court concludes that Petitioner is not entitled to relief based on the claims presented, and DENIES the petition.

**PROCEDURAL HISTORY**

On March 25, 2009, a jury found Petitioner guilty of the kidnapping of Jose Hernandez, torture of Sergio Cabrera, theft of Hernandez, first degree burglary of a residence inhabited by Hernandez and Cabrera, assault with great bodily injury against Hernandez, assault with great bodily injury against Cabrera, battery with serious bodily injury of Cabrera, threats of violence against Hernandez, and dissuading Hernandez and Cabrera by force or threat. (Resp. Memo. P

& A at 1.) The jury also found true several related special circumstances. (*Id.*) On May 6, 2009, the trial court sentenced Petitioner to a term of eighteen years to life in state prison. (*Id.*) Petitioner's co-defendant, Marco Villa, was found guilty of overlapping crimes, and sentenced to a term of thirteen years in state prison. (*Id.*)

On December 21, 2010, the California Court of Appeal affirmed Petitioner's conviction and judgment. (Resp. Ex. J.) On April 13, 2011, the California Supreme Court denied Petitioner's petition for review. (Resp. Ex. M.) On January 25, 2012, the California Supreme Court denied Petitioner's state habeas petition. (Resp. Ex. O.)

On March 14, 2012, Petitioner filed the underlying federal petition for writ of habeas corpus.

## BACKGROUND[1]

A.  Introduction

Victims Jose Hernandez and Sergio Cabrera resided together in the City of Monterey. Ortiz and Villa shared an apartment in the City of Marina. Both Hernandez and Cabrera knew Ortiz from a restaurant where they worked together. One day at work, Ortiz told Hernandez that $15,000 was missing from his apartment and that a person named Douglas (his full name was never ascertained at trial) had stolen it. Douglas had been staying with Ortiz but had disappeared right after Ortiz discovered the money was missing. Ortiz wanted to know if Hernandez knew where Douglas was. Hernandez told him that he did not know.

Three days before the crimes charged in this case, Ortiz came to the victims' apartment and asked Cabrera if he knew where Douglas was. Cabrera learned from Hernandez that Ortiz and Villa were looking for Douglas because Douglas had stolen their money and drugs.

B.  Beating Hernandez

About a month prior to the charged crimes, Hernandez had borrowed $200 from Ortiz. He was to pay him back when he got his paycheck. On Monday, February 18, 2008, Ortiz came to the victims' apartment to give Hernandez a ride to cash his paycheck so he could repay Ortiz the money he owed. They left together around 1:00 p.m. Hernandez cashed the check at a market in Marina. He received $565 and gave $200 to Ortiz. Ortiz then drove to his own apartment and invited Hernandez inside. Inside the apartment Villa was lying on the sofa; Hernandez sat down on the edge. Ortiz then locked the door; he looked upset. He told Hernandez, "I'm going to fuck you up." He accused Hernandez of knowing where Douglas was but Hernandez denied it.

---

[1] The following facts are taken from the California Court of Appeal's opinion.

Ortiz hit Hernandez in the face with his fists. Villa got up, put on his shoes, and came toward Hernandez and, together with Ortiz, threw Hernandez to the floor. Hernandez lay on his back while Ortiz punched him in the eyes and mouth. Villa hit him on the forehead. They held him down and Hernandez did not fight back. Ortiz asked him repeatedly where Douglas was; Hernandez repeatedly denied knowing. Ortiz told Hernandez that Douglas had stolen drugs and $15,000. Villa said some of the money had belonged to him. Villa said nothing about drugs.

The beating continued for about one-half hour. Villa threatened to kill Hernandez. Ortiz "was pretty much following whatever [Villa] was saying at the moment." For example, "[Villa], he was threatening me that he would kill me, and [Ortiz] would say yeah." Villa told Hernandez that he was going to tape his mouth and hands and leave him locked up. Hernandez believed the threats. He was afraid he might die because they were "self-assured about stuff like that." Hernandez saw Villa with a switchblade knife. When Villa tried to cut Hernandez, Hernandez put his hand in the way and got his finger cut. Hernandez kicked the walls and window blinds trying to alert the neighbors.

Defendants finally stopped the beating. The skin around Hernandez's teeth was broken, his eye was swollen, his jaw moved sideways, and his face, head and chest hurt. During the course of the beating, Ortiz took $300 from Hernandez's pocket.

C.   <u>Kidnapping Hernandez</u>

Villa gave Hernandez a sweatshirt to cover the blood on his shirt and the two defendants forced him into the car. They told Hernandez they were going to his place in Monterey to "fuck up" Cabrera and would hit him harder than they had hit Hernandez. They told Hernandez that they were going to lock him inside the car and that they would kill him if he told anyone at the restaurant or if he said anything to the police. In the car, Ortiz was behind the wheel, Villa sat in the front passenger seat, Hernandez was in the back. On the way to Monterey they picked up Marlon Guillen. Guillen got in the back seat with Hernandez. Defendants told Guillen to keep an eye on Hernandez to keep him from escaping.

D.   <u>Beating of Cabrera</u>

On the way to the victims' apartment in Monterey, Ortiz described his plan. Ortiz would go up to the door. Villa was to follow as soon as Ortiz was inside. Before they got to the apartment Ortiz received a call from Cabrera looking for Hernandez and asking Ortiz to pick up a six-pack of beer for him. Ortiz stopped for the beer, then went on to the apartment and parked in front. Defendants told Hernandez not to get out of the car or they would find him and kill him.

Cabrera testified that Ortiz opened the door to the apartment, walked directly over to where Cabrera was sitting, and, with a little smile on his face, started punching Cabrera in the head. Villa came in a minute or two after Ortiz entered. Villa pushed Cabrera, face-down, onto the floor. Cabrera's face and nose were bleeding. Villa put his knee on the back of Cabrera's head and shifted all his weight on to that knee. Cabrera lost "concentration" and felt dizzy. He could not breathe and thought he might die. While Cabrera

was lying there bleeding defendants tied his hands behind him with a telephone cord. Cabrera recalled having been punched many times, mostly by Ortiz, but Villa punched him two or three times as well. All the punches were to his face. The beating lasted about 20 minutes. Ortiz twice asked Cabrera where Douglas was. Villa did not say anything. Defendants untied Cabrera before they left.

After defendants left the apartment, Cabrera got up. He was dizzy and weak and could not open the front door. The police arrived five to 10 minutes later. Cabrera did not recall much of what happened right after the beating. Both sides of his face were swollen. His eyes were "closing" and bleeding, his head hurt, and he had "no energy." A day or two later, Cabrera went to a doctor because he was having bad headaches and was afraid his head was damaged. The ear, nose, and throat specialist who examined Cabrera on February 22, 2008, noted that a CT scan taken on the day of the beating showed that the upper bony portion of Cabrera's nose and the right eye socket bone (the orbital bone) were fractured. The fractures did not require treatment and would heal on their own. The fractured eye socket might have been causing the headaches by allowing air to enter the sinuses under the facial bones. The doctor had "no way to know" what caused the fractures other than what the patient might tell him. The fractures were consistent with the patient's having been hit with a fist.

E. Law Enforcement Investigation

While defendants were inside the victims' apartment beating Cabrera, Hernandez did not stay put. He got out of the car and ran to a nearby fire station. Monterey Police Officer Carrie Hogan was dispatched to the fire station where she found Hernandez with facial injuries. He was distraught. She called for an officer to go to the victims' apartment.

Monterey Police Detective Amy Carrizosa responded and contacted Cabrera at his apartment sometime between 4:00 and 4:30 p.m. on February 18, 2008. Cabrera had cuts, bruises, and swelling all over his face. When she observed him two days later, his face was still bruised and swollen, his lip was swollen and cut, both ears were bleeding and cut, she felt bumps on his head, and his left eye had swollen shut.

During her first interview with Cabrera on the day of the incident, he told her that defendants "had come and were looking for a man, who he later determined was Douglas, because [Douglas] had stolen drugs and/or money from them." He told her that defendants had threatened to kill him and warned that they would kill him if he went to the police. (During his testimony at trial, Cabrera denied that defendants threatened to kill him or told him not to go to the police.)

The day after the incident, the police executed a search warrant at defendants' apartment. Ortiz, Villa, and Guillen were inside. The police found over $3,000 in cash in Ortiz's bedroom and three $100 dollar bills in his wallet. No drugs, drug paraphernalia, or indicia of drug sales were found in the apartment. No switchblade knife was found.

F. Defense Case

Villa testified in his defense, claiming that Douglas had stolen money

   and a computer, not drugs. He also maintained that he, Villa, had walked in on the two beatings and that in both instances he did not join in but tried to pull Ortiz off his victims. Ortiz did not testify. Both defendants focused upon inconsistencies in the victims' stories.

(Resp. Ex. J at 2-6.)

## DISCUSSION

A. <u>Standard of Review</u>

  This Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

  "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413.

  "[A] federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, the application must also be unreasonable." *Id.* at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *Id.* at 409.

B.   Analysis

In the petition, Petitioner claims that: (1) there was insufficient evidence to support the finding that Petitioner was acting "for the benefit of a gang," and trial and appellate counsel were ineffective for failing to raise this claim; (2) the trial court erred in admitting evidence of gang and drug activity, and trial and appellate counsel were ineffective for failing to raise this claim; (3) trial counsel was ineffective for failing to assert a "provocation" defense, and appellate counsel was ineffective for failing to raise this claim on appeal; (4) trial and appellate counsel were ineffective for failing to raise the issue of the timing of provocation;[2] (5) the prosecutor committed misconduct by introducing evidence of drug activity, and counsel was ineffective for failing to object; (6) the trial court failed to properly instruct the jury on the asportation element of simple kidnapping; and (7) there was cumulative prejudice.

### 1.   Insufficient evidence

Petitioner argues that there was insufficient evidence to show that he acted "for the benefit of a gang" as defined in *Garcia v. Carey*, 395 F.3d 1099, 1102-03, n.5 (9th Cir. 2005).[3] (Pet. at 5.) Petitioner further argues that the prosecution improperly introduced facts regarding gang membership, and cites to California Penal Code § 186.22(b)(1).[4] Petitioner also claims that both trial and appellate counsel were ineffective for failing to raise this claim.

---

[2] The Court will address this claim in conjunction with the previous claim regarding provocation.

[3] Petitioner adds that because evidence of gang association or membership was not an element of the crime of criminal threats, Cal. Penal Code § 422, the trial court erred in permitting introduction of such evidence. (Traverse at 10-11.) However, "[a] traverse is not the proper pleading to raise additional grounds." *Cacoperdo v. Demosthenes*, 37 F.3d 504, 507 (9th Cir. 1994). Nonetheless, a district court has the discretion to consider evidence and claims raised for the first time after the filing of the petition. *See Brown v. Roe*, 279 F.3d 742, 745 (9th Cir. 2002). The Court will address this claim in the following section regarding the admission of evidence.

[4] Section 1866.22(b)(1) provides that a sentencing enhancement for participation in a criminal street gang shall be applied to "any person who is convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members."

However, as Respondent notes, Petitioner was not given a sentencing enhancement for participation in a gang. Further, there was no gang allegation, and no gang finding. Accordingly, Petitioner is not entitled to habeas relief for this claim. For these same reasons, Petitioner's allegations that trial and appellate counsel were ineffective for failing to raise this claim also fail.

### 2. Admission of Evidence

Petitioner claims that the introduction of gang and drug-related conduct was improper because neither gang or drug-related evidence was an element of any crime charged. Further, argues Petitioner, the jury made specific findings as to uncharged gang and drug-related conduct. Petitioner also claims that both trial and appellate counsel were ineffective for failing to raise this claim. In response, Respondent states that the state court reasonably rejected Petitioner's claim regarding introduction of gang evidence, and that Petitioner's claim regarding the drug evidence is unexhausted and without merit.

#### a. Gang evidence

At trial, Petitioner moved to preclude the prosecution from introducing any evidence that Petitioner or his co-defendant may have alluded to regarding gang ties. (Resp. Ex. K at 10.) The prosecutor responded that co-defendant Villa's statement to Hernandez that Villa was a gang member in Salinas who knew many violent people if Hernandez were to go to the police, was relevant to prove an element of the crime of criminal threats. (*Id.* at 10-11.)

The state appellate court rejected Petitioner's claim:

> Evidence Code section 352 gives the trial court the discretion to exclude relevant evidence if the court determines that the probative value of the evidence is "substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." The trial court's ruling on a Evidence Code section 352 objection "'must not be disturbed on appeal except on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice.'" (*People v. Rodrigues* (1994) 8 Cal. 4th 1060, 1124.) We detect no abuse of discretion here.
>
> Defendants were charged with making criminal threats against Hernandez in violation of section 422. [FN4] To prove the crime of criminal threat, the prosecution must prove, among other things, that the threat caused the victim to be in sustained fear for his or her own safety or for his or her

> immediate family's safety and that the fear was reasonable under the circumstances. (§ 422; *People v. Toledo* (2001) 26 Cal. 4th 221, 228.) The prosecution sought to introduce Villa's statement about belonging to a gang in order to prove the reasonableness of 'belief that he would actually be killed if he went to the police.
>
> > FN4. Section 422 states: "Any person who willfully threatens to commit a crime which will result in death or great bodily injury to another person, with the specific intent that the statement, made verbally, in writing, or by means of an electronic communication device, is to be taken as a threat, even if there is no intent of actually carrying it out, which, on its face and under the circumstances in which it is made, is so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat, and thereby causes that person reasonably to be in sustained fear for his or her own safety or for his or her immediate family's safety, shall be punished by imprisonment in the county jail not to exceed one year, or by imprisonment in the state prison."
>
> Defendants claim that there was plenty of other evidence of threats so that the evidence that Villa claimed to belong to a gang was cumulative and, given its inflammatory nature, was unduly prejudicial. As the Attorney General maintains, the argument misses the point. There were plenty of threats. But the prosecution had to prove that the threats were credible, that Hernandez reasonably believed defendants would carry out the threat to kill him or his family. There was no evidence that either defendant had a history or reputation for violence that would help make a murder threat credible. Evidence that Villa claimed to belong to a gang – whether or not he actually belonged to one – would tend to show that it was reasonable for Hernandez to be afraid that Villa would carry out his threat to kill him. Thus, the evidence was relevant and was not cumulative of any other direct evidence on the point. We conclude, therefore, that the trial court's decision to allow the evidence was an appropriate exercise of discretion. [FN5]
>
> > FN5. As it turned out, the ruling did not result in the introduction of any gang evidence. The prosecutor was unable to elicit the testimony from Hernandez. And when the prosecutor asked Villa if he had told Hernandez that he was a gang member, Villa denied it. The prosecutor made no further mention of gangs. The only additional mention came from Villa's counsel, who, during argument, compared the prosecutor's question to a person's yelling "shark" at the beach. "If you want to get a conviction in Salinas, California, just say 'gang.' That will help."

(Resp. Ex. J at 20-21.)

The admission of evidence is not subject to federal habeas review unless a specific constitutional guarantee is violated or the error is of such magnitude that the result is a denial of the fundamentally fair trial guaranteed by due process. *See Henry v. Kernan*, 197 F.3d 1021, 1031 (9th Cir. 1999); *Colley v. Sumner*, 784 F.2d 984, 990 (9th Cir. 1986). The Supreme Court

1  "has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence
2  constitutes a due process violation sufficient to warrant issuance of the writ." *Holley v.*
3  *Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009) (finding that trial court's admission of
4  irrelevant pornographic materials was "fundamentally unfair" under Ninth Circuit precedent but
5  not contrary to, or an unreasonable application of, clearly established Federal law under
6  § 2254(d)). Failure to comply with state rules of evidence is neither a necessary nor a sufficient
7  basis for granting federal habeas relief on due process grounds. *See Henry*, 197 F.3d at 1031.
8  The due process inquiry in federal habeas review is whether the admission of evidence was
9  arbitrary or so prejudicial that it rendered the trial fundamentally unfair. *Walters v. Maass*, 45
10 F.3d 1355, 1357 (9th Cir. 1995). Only if there are no permissible inferences that the jury may
11 draw from the evidence can its admission violate due process. *See Jammal v. Van de Kamp*, 926
12 F.2d 918, 920 (9th Cir. 1991). Here, as the state appellate court concluded, Villa's statement to
13 Hernandez was relevant to support the proposition that it was reasonable for Hernandez to be
14 afraid that Villa would carry out his threat to kill him.

15 Moreover, the Supreme Court "has not yet made a clear ruling that admission of
16 irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant
17 issuance of the writ." *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009) (finding that
18 trial court's admission of irrelevant pornographic materials was "fundamentally unfair" under
19 Ninth Circuit precedent but not contrary to, or an unreasonable application of, clearly established
20 Federal law under § 2254(d)). Because there is no Supreme Court precedent that controls on this
21 legal issue, the state court's decision cannot be contrary to, or an unreasonable application of,
22 clearly-established federal law. *Carey v. Musladin*, 549 U.S. 70, 77 (2006).

23 Petitioner also claims that trial and appellate counsel were ineffective for failing to
24 challenge the introduction of this "gang" evidence. A claim of ineffective assistance of counsel
25 is cognizable as a claim of denial of the Sixth Amendment right to counsel, which guarantees not
26 only assistance, but effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 686
27 (1984). The benchmark for judging any claim of ineffectiveness must be whether counsel's
28 conduct so undermined the proper functioning of the adversarial process that the trial cannot be

relied upon as having produced a just result. *Id.* In order to prevail on a Sixth Amendment ineffectiveness of counsel claim, Petitioner must establish two things. First, he must establish that counsel's performance was deficient, i.e., that it fell below an "objective standard of reasonableness" under prevailing professional norms. *Id.* at 687-88. Second, he must establish that he was prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.* Because the admission of this "gang" evidence was not in error, Petitioner's claims that trial and appellate counsel provided deficient performance when they failed to raise the claim necessarily fails. *See Strickland*, 466 U.S. at 686-88.

Accordingly, Petitioner has failed to demonstrate that the state court's rejection of these claims was contrary to, or an unreasonable application of, clearly established Supreme Court law. 28 U.S.C. § 2244(d).

          b.        <u>Drug-related evidence</u>

Petitioner claims that the introduction of evidence regarding drug activity violated his right to due process. Petitioner further argues that trial and appellate counsel were ineffective for failing to raise this claim. Respondent argues that Petitioner's due process challenge is unexhausted, and that Petitioner is challenging the same "drug" evidence he challenges in his prosecutorial misconduct claim. Even if a claim is unexhausted, the Court may still deny it on the merits. *See* 28 U.S.C. § 2254(b)(2). For organizational purposes, because this claim is closely related to Petitioner's prosecutorial misconduct claim, the Court will address this claim in Section 4, along with Petitioner's prosecutorial misconduct claim.

        3.        <u>Provocation defense</u>

Petitioner claims that trial counsel should have used provocation as a defense to the charge of torture, and appellate counsel was ineffective for failing to raise the same issue.

The California Supreme Court denied this claim without comment.

The crime of torture has two elements: (1) infliction of great bodily injury, and (2) specific intent to cause cruel or extreme pain and suffering for the purpose of revenge, extortion,

persuasion, or for any sadistic purpose. *People v. Massie*, 142 Cal. App. 4th 365, 370-71 (2006). Respondent argues, and the Court agrees, that while provocation is a defense to the crime of murder, there is no support for the proposition that provocation is a viable defense to the crime of torture. Petitioner's citations to the contrary are inapposite. *See, e.g.*, *People v. Cole*, 33 Cal. 4th 1158, 1211-12 (2004) (reiterating instructions that clarified that the existence of evidence of provocation may have a bearing on the question of whether murder was in the first or second degree); *People v. Middleton*, 52 Cal. App. 4th 19, 29-33 (1997) (discussing that provocation was a partial defense to first degree murder). For the same reason, Petitioner's argument that the length of time between an alleged provocation and the commission of the crime should not diminish the effectiveness of a provocation defense is meritless.

Because provocation is not a defense to the crime of torture, Petitioner's claims that trial and appellate counsel provided deficient performance when they failed to argue such defense fails. *See Strickland v. Washington*, 466 U.S. 668, 686-88 (1984).

        4. <u>Drug activity evidence</u>

Petitioner claims that the prosecutor committed misconduct when he improperly introduced evidence regarding drug activity, and defense counsel rendered ineffective assistance for failing to object. The California Court of Appeal summarized the facts below:

> Prior to trial, defendants moved to exclude evidence that they had been involved in drug use or drug trafficking. Defendants argued that the evidence was irrelevant and highly prejudicial. The prosecutor argued that the evidence was important to the People's theory of the case, it was relevant to the motive for the two beatings, and it explained why defendants had not reported Douglas's theft to the police. During oral argument on the motion it became clear that there were two types of drug-related evidence: evidence of defendants' reputation as drug dealers and evidence of drug-related statements one or the other defendant made to the victims. The trial court denied defendants' motion but asked the prosecutor to alert the court before introducing the former type of evidence. Specifically, the trial court held:
>
> "I'm not going to grant a motion to exclude statements, references, during the course of this – the actual activity that is the subject of these charges that involves that kind of a comment; whether that – whether there are other – whether witnesses might know that the person is an axe murderer or a drug dealer, that's different though.
>
> "So it's a little bit difficult, but where – where the comments are coming in during the course of the – you know, the res gestae, as it were, for lack of a better way of putting it, during the course of the commission of the

offenses, that one thing. Where it's some kind of knowledge, separate and apart from that, from prior experience or whatever it might be, the Court would want to know that in advance and have some kind of an offer of proof as to why that would come in and why it wouldn't be – and we would have a discussion about why it wouldn't be excluded under [Evidence Code section] 352. So be very sensitive to that, please."

At trial, the prosecutor asked Hernandez if either Villa or Ortiz "mention[ed] drugs at any time during that day?" Hernandez initially said no but when pressed he said that Ortiz had said that Douglas had stolen "drugs and the money." Hernandez confirmed that the amount of money Ortiz claimed to have lost was $15,000.

Later, in the prosecutor's cross examination of Villa, he asked, "Have you ever seen [Ortiz] sell drugs?" "Ever seen drugs around the apartment?" "Ever been involved with him in selling drugs?" Villa responded in the negative to each question. Defense counsel interposed no objections. A bit later, the prosecutor asked, "Are you concerned that someone would find out about the drug selling that was going on?" Counsel objected to this question as argumentative and the trial court sustained the objection. The prosecutor then asked Villa if he was concerned that the police might wonder why there was $15,000 in the apartment. Villa replied that he had not known there was $15,000 in the apartment.

Officer Octavio Barocio was called as a witness for Villa. Villa's counsel asked him about his interview of Hernandez: "And he made no statement whatsoever about Marco Villa selling drugs; correct?" The officer responded, "No." On cross examination, the prosecutor attempted to clarify the answer: "Clarify on your last no, he didn't say anything about Marco Villa selling drugs. Does that mean he didn't say it or he did say something about Marco Villa selling drugs." Barocio referred to his report of the interview and then answered, "I believe in my report I wrote that [Ortiz] – he gave me the statement that [Ortiz] [FN3] was selling drugs out of his apartment."

>FN3. Defendant's name is Samuel Perez Ortiz. Some of the police officers referred to him as "Perez" but he was known as Ortiz to the trial court.

Finally, the evidence had shown that Ortiz had two apartments, one he sublet to Guillen and one where he resided with Villa. The prosecutor asked Barocio, "Now in your experience in narcotics and narcotics detection and such, do some drug dealers keep two residences, or two locations, one where they can sell out of and one where they live?" Barocio responded, "My cases, that I have investigated, have shown that."

(Resp. Ex. J at 16-18.) Petitioner claims that the prosecutor committed misconduct when he questioned Villa and Officer Barocio about drugs, and then stressed the connection to drugs in his closing argument to the jury.

Respondent argues, and the Court agrees, that Petitioner's prosecutorial misconduct is procedurally barred. The state appellate court declined to address the claim, stating that

1  Petitioner failed to object to these alleged instances of misconduct and recognized that, "As a
2  general rule, a defendant may not complain on appeal of prosecutorial misconduct unless in a
3  timely fashion, and on the same ground, the defendant raised an objection and requested that the
4  jury be admonished to disregard the impropriety." (Resp. Ex. J at 18.) The Ninth Circuit has
5  recognized and applied the California contemporaneous objection rule in affirming denial of a
6  federal petition on grounds of procedural default where there was a complete failure to object at
7  trial. *See Inthavong v. Lamarque*, 420 F.3d 1055, 1058 (9th Cir. 2005); *Paulino v. Castro*, 371
8  F.3d 1083, 1092-93 (9th Cir. 2004); *Rich v. Calderon*, 187 F.3d 1064, 1069-70 (9th Cir. 1999).
9  Petitioner does not contest that this claim was forfeited. Accordingly, the Court finds that
10 Petitioner's prosecutorial misconduct claim is procedurally barred.

11       Relatedly, Petitioner claims that counsel rendered ineffective assistance of counsel by
12 failing to object to the prosecutor's statements. The California Court of Appeal rejected this
13 claim, concluding that Petitioner failed to demonstrate prejudice.

> According to defendants, the drug-dealing evidence was highly prejudicial so that absent the improper questions to Villa and Officer Barocio, it is reasonably likely the jury, which deliberated for several days, would have reached a different result, particularly on the torture count, if counsel had objected and the jury been admonished. But even if the allegedly improper evidence had been stricken, that would not have eliminated the drug-dealing evidence that was properly admitted through Hernandez.
>
> Defendants insist that Hernandez's testimony pertaining to Ortiz's having drugs stolen from him established only that Ortiz once possessed drugs. According to defendants, the further inference, that Ortiz was a drug dealer, is speculation. We disagree. The further inference is supported by Hernandez's testimony that along with the drugs, Ortiz claimed to have lost $15,000. Evidence of that unreported loss of $15,000 in cash supports the inference that Ortiz was involved in something illegal, like selling drugs. The little additional evidence the prosecutor was able to elicit with the allegedly improper questions gave the jury no more prejudicial information than that which the prosecutor had appropriately elicited from Hernandez. Thus, even if counsel had objected to the prosecutor's questions, and even if the objections had been sustained and the jury admonished, the jury would still have the evidence that Ortiz told Hernandez that Douglas had stolen his drugs and $15,000. And the prosecutor would still have been entitled to rely upon that evidence [in] his argument to the jury. It is not reasonably likely that absent the little bit of evidence the prosecutor was able to elicit through Barocio, which merely reiterated that which Hernandez had said, the jury would have reached a different result.

(Resp. Ex. J at 19-20.)

As the state appellate court noted, Petitioner does not challenge Hernandez's testimony that Petitioner admitted that Douglas stole drugs and $15,000 from Petitioner's apartment. With that evidence admitted, the challenged evidence was insignificant. Specifically, the prosecutor was not able to gain any information regarding Petitioner and drugs from Villa, and Barocio's testimony merely supported the testimony Hernandez already gave regarding Petitioner's own admission that Douglas stole drugs and money. Thus, even if trial counsel would have objected to the prosecutor's questions, there is no reasonable probability that the result of the proceeding would have been different. *See Strickland*, 466 U.S. at 694.

For similar reasons, Petitioner's argument that the admission of this evidence violated his right to due process fails. Because the challenged evidence was merely cumulative, its admission could not have denied Petitioner a fundamentally fair trial. *See Henry v. Kernan*, 197 F.3d 1021, 1031 (9th Cir. 1999). Moreover, Petitioner cannot demonstrate that, even if the admission of such evidence was in error, its admission warrants habeas relief. *See Holley*, 568 F.3d at 1101.

5. <u>Jury instruction on asportation</u>

Petitioner claims that the trial court erred by failing to properly instruct the jury on the asportation element of simple kidnapping. Specifically, Petitioner argues that the trial court should have instructed the jury that it needed to consider whether Petitioner moved the victim a "substantial distance."

The California Court of Appeal rejected Petitioner's claim below, concluding that even if the jury instruction was erroneous, any error was harmless.

> Under section 207, subdivision (a), simple kidnapping occurs when a "person who forcibly, or by any other means of instilling fear, steals or takes, or holds, detains, or arrests any person in this state, and carries the person into another country, state, or county, or into another part of the same county." In short, the crime has three elements: "(1) a person was unlawfully moved by the use of physical force or fear; (2) the movement was without the person's consent; and (3) the movement of the person was for a substantial distance." (*People v. Jones* (2003) 108 Cal. App. 4th 455, 462.) The movement element is called "asportation." (*People v. Rayford* (1994) 9 Cal. 4th 1, 14; *Bell*, *supra*, 179 Cal. App. 4th at p. 435.)
>
> In this case, the trial court instructed the jury in the language of CALCRIM No. 1215 and explained the "substantial distance" element as

follows: "Substantial distance means more than a slight or trivial distance. In deciding whether the distance was substantial, you must consider all the circumstances related to the movement. Thus, in addition to considering the actual distance moved, you may also consider other factors such as whether the movement increased the risk of physical or psychological harm, increased the danger of a foreseeable escape attempt, gave the attacker a greater opportunity to commit additional crimes, or decreased the likelihood of detection."

Citing *Bell*, Ortiz maintains that the foregoing instruction failed to instruct the jury to also consider whether the movement went beyond that merely incidental to the other crimes charged. The Attorney General argues that *Bell* was incorrectly decided, the case is distinguishable, and any error was harmless. The final argument is dispositive.

Kidnapping for robbery (§ 209, subd. (b)), like other forms of aggravated kidnapping, requires movement of the victim "that is not merely incidental to the commission of the underlying crime and that increases the risk of harm to the victim over and above that necessarily present in the underlying crime itself." (*People v. Martinez* (1999) 20 Cal. 4th 225, 232 (*Martinez*); § 209, subd. (b).) Thus, in *People v. Daniels* (1969) 71 Cal.2d 1119, 1130-1131, the Supreme Court held that the defendants' moving their victims from one room to another in order to rob them or to commit rapes was not kidnapping because "the brief movements which they compelled their victims to perform were solely to facilitate such crimes." Since such movements were merely incidental to the robberies and rapes, the Legislature could not reasonably have intended the movement to be taking the victim into another part of the same county. (*Ibid.*)

As *Bell* noted, however, simple kidnapping does not include the requirement that the movement be beyond that "'merely incidental to'" an underlying crime because, in simple kidnapping, no underlying crime is required. (*Bell*, *supra*, 179 Cal. App. 4th at p. 436.) Historically, asportation for simple kidnapping required only an assessment of the "actual distance" the victim was moved. (*People v. Caudillo* (1978) 21 Cal. 3d 562, 574; *see also People v. Stanworth* (1974) 11 Cal. 3d 588, 603.) Martinez changed the historical standard and required the finder of fact to "consider the totality of the circumstances" in deciding whether a victim's movement was substantial. (*Martinez*, *supra*, 20 Cal. 4th at p. 237.) "Thus, in a case where the evidence permitted, the jury might properly consider not only the actual distance the victim is moved, but also such factors as whether that movement increased the risk of harm above that which existed prior to the asportation, decreased the likelihood of detection, and increased both the danger inherent in a victim's foreseeable attempts to escape and the attacker's enhanced opportunity to commit additional crimes." (*Ibid.*) In addition, the jury could consider "whether the distance a victim was moved was incidental to the commission of" an "associated crime." (*Ibid.*) *Bell* held that an "'associated crime,'" within the meaning of the *Martinez* holding, "is any criminal act the defendant intends to commit where, in the course of its commission, the defendant also moves a victim by force or fear against his or her will. It is not more complicated than that." (*Bell*, *supra*, 179 Cal. App. 4th at pp. 438-439.)

In *Bell*, the defendant drove away with his former wife in the passenger seat, after he was approached by police attempting to arrest him. He traveled about 70 yards down the street, stopped to let the victim out, and

then continued his reckless evasion of the police. (*Bell*, *supra*, 179 Cal. App. 4th at pp. 432-433.) He was convicted of both reckless evasion and kidnapping. (*Id.* at p. 433.) The trial court gave the same instruction the trial court gave in this case and, as here, did not give the optional language, which stated, "'In order for the defendant to be guilty of kidnapping, the other person must be moved or made to move a distance beyond that merely incidental to the commission of [the associated crime].'" (*Id.* at p. 440; CALCRIM No. 1215.)

*Bell* held that it was reversible error not to have given an instruction directing the jury to consider whether the movement of the victim had been merely incidental to the crime of reckless evasion. (*Bell*, *supra*, 179 Cal. App. 4th at pp. 439-440.) Given the evidence, the jury could have decided that the defendant's movement of the victim 70 yards down the street was not substantial but merely incidental to the associated crime. (*Id.* at p. 440.) *Bell* also held that the bracketed language in CALCRIM No. 1215 was misleading because it suggested that the "merely incidental" finding was a threshold consideration. *Bell* believed that the language in the pattern instruction could have led a jury to think that it had to acquit a defendant if "the movement was compelled 'in the course of' committing the associated crime, regardless of the increased risk of danger to the victim, or, for that matter, that the distance was 'substantial' by any reasonable measure." (*Bell*, *supra*, at p. 440.) Thus, according to *Bell*, a correct instruction would be: "'[I]n addition to considering the actual distance moved, you may also consider other factors such as whether the [distance the other person was moved was beyond that merely incidental to the commission of the crime of evading a police officer]'" or the other circumstances currently listed in CALCRIM No. 1215. (*Bell*, *supra*, at pp. 440-441.)

Ortiz maintains that the criminal threat and dissuading a witness crimes were associated with the asportation of Hernandez since he was threatened while he was in the car with defendants as they drove from Marina to Monterey to beat up Cabrera. Ortiz also argues that the asportation facilitated the torture and assault crimes because it prevented Hernandez from going for help. Thus, according to Ortiz, had the jury been correctly instructed, the jury might have decided the movement was not "substantial" because the movement was merely incidental to these associated crimes. We are convinced beyond a reasonable doubt that such an instruction would not have affected the verdict. (*See Chapman v. California*, *supra*, 386 U.S. 18, 24.)

Even if the jury were to have found that the movement of Hernandez was incidental to one or more of the other crimes Ortiz committed, any reasonable jury would still have found the movement to be substantial. Ortiz moved Hernandez from Marina to Monterey. While the precise distance between the two cities does not appear in the record, we may take judicial notice of the fact that Marina is at least six miles from Monterey. [FN6.] Considering only the actual distance moved, the movement was "'substantial' by any reasonable measure." (*Bell*, *supra*, 179 Cal. App. 4th at p. 440.) Application of all the other factors further supports a finding that the movement was "substantial." The movement increased the risk of harm to Hernandez and the danger inherent in his foreseeable attempt to escape; it gave his attackers opportunity to commit additional crimes against him; it decreased the likelihood of detection by keeping Hernandez away from his workplace and away from any other public place where he might have

> attracted attention or called for help. No reasonable jury would have found that simply because Ortiz committed additional crimes against Hernandez while he drove him from Marina to Monterey, or because the movement prevented Hernandez from calling for help before defendants could get to Cabrera, that the movement was merely incidental to these other crimes and not "substantial" in and of itself. We conclude, therefore, that even if the instruction should properly have been given, the failure to do so did not affect the result.
>
> > FN6. <http://maps.google.com/maps?q=marinaKey NumbertoKey Numbermonterey> (as of Oct. 20, 2010).

(Resp. Ex. J at 22-26.)

A jury instruction that omits an element of an offense is constitutional error subject to "harmless error" analysis. *See Evanchyk v. Stewart*, 340 F.3d 933, 940 (9th Cir. 2003). Harmless error applies whether the error is characterized as a misdescription of an element of an offense in a jury instruction, or as an omission of the element. *See California v. Roy*, 519 U.S. 2, 5 (1996) (omission of "intent" element from aiding and abetting instruction subject to harmless error analysis where jury could have found intent based on evidence it considered). The omission will be found harmless unless it "'had substantial and injurious effect or influence in determining the jury's verdict.'" *Id.* at 4 (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).

Here, according to *Bell*, "one of the additional factors to be considered in determining the movement's substantiality is whether the movement of the victim was for a distance beyond that which was incidental to the commission of an associated crime. . . . Thus, whether the movement was over a distance merely incidental to an associate crime is simply one of several factors to be considered by the jury (when permitted by the evidence) under the "totality of the circumstances" test enunciated in *Martinez*." 179 Cal. App. 4th at 440. As the state appellate court found, even if the failure to instruct the jury to consider whether the movement went beyond that incidental to the other crimes, any error was harmless. Based on the record, the state appellate court was reasonable in concluding that any reasonable jury would have found the distance traveled was substantial, and beyond that merely incidental to the other crimes.

Accordingly, Petitioner has failed to demonstrate that the state court's rejection of this claim was contrary to, or an unreasonable application of, clearly established Supreme Court law.

28 U.S.C. § 2244(d).

### 6. Cumulative error

In some cases, although no single trial error is sufficiently prejudicial to warrant reversal, the cumulative effect of several errors may still prejudice a defendant so much that his conviction must be overturned. *See Alcala v. Woodford*, 334 F.3d 862, 893-95 (9th Cir. 2003) (reversing conviction where multiple constitutional errors hindered defendant's efforts to challenge every important element of proof offered by prosecution). However, where as here, there is no single constitutional error existing, nothing can accumulate to the level of a constitutional violation. *See Hayes v. Ayers*, 632 F.3d 500, 524 (9th Cir. 2011).

## CONCLUSION

Petitioner's petition for writ of habeas corpus is DENIED.

The federal rules governing habeas cases brought by state prisoners require a district court that denies a habeas petition to grant or deny a certificate of appealability ("COA") in its ruling. *See* Rule 11(a), Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254. Petitioner has not shown "that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Accordingly, a COA is DENIED.

The Clerk shall close the file.

IT IS SO ORDERED.

DATED: 5/15/13

LUCY H. KOH
United States District Judge